[S.F. No. 24393. Mar. 11, 1982.]

JAMES BROSNAHAN et al., Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
·PAUL GANN et al., Real Parties in Interest.

**COUNSEL**

Ephraim Margolin, William Mount, Laurance S. Smith and Brent A. Barnhart for Petitioners.

Anthony L. Miller, Richard B. Maness and William P. Yee for Respondents.

Dobbs & Nielsen, John E. Mueller, James R. Parrinello and Marguerite M. Leoni for Real Parties in Interest.

**OPINION**

**THE COURT.—** In this proceeding petitioners seek to prevent respondent Secretary of State from instituting measures preparatory to placing on the ballot at the June 1982 Primary Election an initiative measure relating to "Criminal Justice" and entitled (in § 1 thereof) "The Victims' Bill of Rights." Petitioners assert that respondent has failed to comply with certain statutory provisions regarding the number of valid signatures required to qualify the measure for the ballot, and that the proposed measure is unconstitutional because it contains more than one subject (Cal. Const., art. II, § 8, subd. (d)) and amounts to a "revision" of the Constitution rather than an "amendment" thereto (see *id.*, art. XVIII, §§ 1-3).

The proponents of the initiative measure duly presented to the appropriate public officials petitions containing 663,409 signatures. The

number of valid signatures necessary to qualify the measure for the ballot under article II, section 8, subdivision (b), of the Constitution is 553,790. Upon examination of the certificates submitted by county officials on the basis of the random sampling provided for in the Elections Code, respondent determined that the petitions contained 108.76 percent of the number of signatures required for a place on the ballot. Respondent refused to take steps to submit the measure to the voters on the ground that the number of valid signatures disclosed by the sample fell short of the 110 percent then required by section 3520, subdivision (g). Instead, she ordered local election officials to verify each signature.

The proponents of the measure, real parties in interest in the present proceeding, sought a writ of mandate before the Superior Court of Sacramento County to compel respondent to certify the initiative as having qualified for the ballot, and to take the steps required by law to place it before the voters. Respondent took the position that, although she was prohibited by law from certifying the petitions because random sampling indicated fewer than 110 percent valid signatures, she was nevertheless of the opinion that the 108.76 percent valid signatures found on the petitions constituted substantial compliance with the requirement of the Elections Code to qualify the measure for the ballot without the need for verification of each signature. Following entry of a judgment, stipulated by the parties, to the effect that real parties had substantially complied with the requirements of the Elections Code so as to qualify the initiative for the ballot, a writ of mandate was issued by the trial court directing respondent to certify the initiative for the June 8, 1982, Primary Election, and to take other steps required by law to place the measure before the voters in that election.

Thereafter, petitioners, who are electors in various counties of the state, filed with us an original petition for writ of mandate and prohibition to prevent respondent from certifying the initiative and to restrain her from performing any act in aid of submission of the measure to the voters. Because of the importance of the questions presented and the time constraints involved, we issued an alternative writ of mandate and expedited briefing and oral argument. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808 [114 Cal.Rptr. 577, 523 P.2d 617] and cases cited.) We also issued a stay prohibiting enforcement of the trial court's writ of mandate pending final disposition of the present proceeding.

While this litigation was pending, the Legislature passed, and the Governor signed, an urgency measure (Stats. 1982, ch. 102) providing that if, on or before January 28, 1982, the Secretary of State received from the several county clerks certificates, based on a random sampling technique, establishing that the number of valid signatures affixed to an initiative petition is more than 105 percent of the number of qualified voters needed, the petition shall be deemed to have qualified for the ballot. The Secretary of State received such certificates on or before January 28, 1982.

We conclude that the initiative measure should be placed on the ballot of the June 1982 Primary Election.

We do not reach the other issues raised by petitioners. As we have frequently observed, it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. (E.g., *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 535 [50 Cal.Rptr. 881, 413 P.2d 825]; *Wind* v. *Hite* (1962) 58 Cal.2d 415, 417 [24 Cal.Rptr. 683, 374 P.2d 643]; *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 256-257 [101 Cal.Rptr. 628].)

The stay of enforcement of the judgment in Sacramento Superior Court, No. 301007, is vacated, and the peremptory writs of mandate and prohibition are denied. The judgment is final forthwith.

Newman, J., dissented.

**BROUSSARD, J., Concurring.**—Article II, section 8 of the California Constitution states that "an initiative measure embracing more than one subject *may not be submitted to the electors or have any effect.*" (Italics added.) Thus, the question whether the proposed criminal justice initiative violates the single subject requirement is one which under normal circumstances should be decided before the initiative is submitted to the electorate. The Constitution recognizes, however, that it may be impractical to decide whether an initiative violates the single subject requirement before it is submitted to the voters, and therefore provides

that an initiative which does not conform to that requirement, even if approved by a majority, shall not "have any effect."

Unfortunately, present circumstances compel an immediate decision as to whether the measure will go on the ballot. Time is lacking for the careful study and consideration, the collegial discussion, and the mutual criticism of opinion drafts which an issue of this importance requires. I therefore join the by the court opinion with the understanding that it in no way precludes review of the single subject issue subsequent to the June 1982 Primary Election.

**MOSK, J.,** Concurring and Dissenting.—

I.

With unseemly haste and overlooking conflicting code sections (e.g., Elec. Code, § 3521, subd. (a)), the Legislature has attempted to decide a pending lawsuit by the remarkable method of adopting an urgency statute which in actuality applies only to this proposed initiative and to no other, past, present or future.

At the very least, the preferential treatment accorded the proponents of this measure severely taxes article I, section 7, subdivision (b), of the Constitution, which provides that a "citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens." More broadly, the legislative preference granted only to these proponents suggests that varying numerical standards for the qualification of initiatives prevail in this state, dependent solely upon whether the legislators like or dislike a proposal to be voted on by the people.

Despite my misgivings, however, I doubt the wisdom of this court, or any court, probing behind a measure adopted by the Legislature and signed by the Governor. (*People v. County of Santa Clara* (1951) 37 Cal.2d 335, 337 [231 P.2d 826]; *Spaulding v. Desmond* (1922) 188 Cal. 783, 790 [207 P. 896].) In deference to the legislative determination that the law be changed to accommodate the proponents of this petition, I concede that the initiative measure—under the newly created standard—meets the ballot mathematical requirement.

## II.

Unlike the majority, however, I believe we are required to reach petitioners' second contention: that the criminal justice initiative violates the constitutional command that "an initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Art. II, § 8, subd. (d).) Before analyzing the merits of this claim, I deal with the opinion of the majority that the proper time to address constitutional challenges to the initiative is when and if it becomes law.

The principle is firmly established that unless it is clear that a proposed initiative is unconstitutional, the courts should not interfere with the right of the people to vote on the measure. In the service of this precept, courts have frequently declined to strike an initiative from the ballot despite a claim that its adoption would be a futile act because the measure offends the Constitution. (E.g., *Mulkey v. Reitman* (1966) 64 Cal.2d 529, 535 [50 Cal.Rptr. 881, 413 P.2d 825]; *Gayle v. Hamm* (1972) 25 Cal.App.3d 250, 256-258 [101 Cal.Rptr. 628].)

But this rule applies only to the contention that an initiative is unconstitutional because of its substance. If it is determined that the electorate does not have the power to adopt the proposal in the first instance or that it fails to comply with the procedures required by law to qualify for the ballot, the measure must be excluded from the ballot.

Thus, for example, election officials have been ordered not to place initiative and referendum proposals on the ballot on the ground that the electorate did not have the power to enact them since they were not legislative in character (e.g., *Simpson v. Hite* (1950) 36 Cal.2d 125, 129-134 [222 P.2d 225]; *Fishman v. City of Palo Alto* (1978) 86 Cal. App.3d 506, 511-512 [150 Cal.Rptr. 326]; cf. *Farley v. Healey* (1967) 67 Cal.2d 325, 328-329 [62 Cal.Rptr. 26, 431 P.2d 650]), the subject matter was not a municipal affair (e.g., *Riedman v. Brison* (1933) 217 Cal. 383, 387 [18 P.2d 947]; *Mervynne v. Acker* (1961) 189 Cal. App.2d 558, 565-566 [11 Cal.Rptr. 340]), or the proposal amounted to a revision of the Constitution rather than an amendment thereto (*McFadden v. Jordan* (1948) 32 Cal.2d 330, 349-351 [196 P.2d 787]).

Cases in which initiatives were excluded because they failed to comply with requirements of law to qualify for the ballot usually involved the violation of laws designed to prevent voter deception or confusion.

(E.g., *Clark* v. *Jordan* (1936) 7 Cal.2d 248, 252 [60 P.2d 457, 106 A.L.R. 549]; *Boyd* v. *Jordan* (1934) 1 Cal.2d 468, 470-475 [35 P.2d 533]; *Myers* v. *Stringham* (1925) 195 Cal. 672, 675-676 [235 P. 448].)

The objective of the constitutional provision limiting initiatives to a single subject is to minimize the risk of confusion and deception of the voters. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) The limitation was itself adopted by initiative at the General Election of November 2, 1948, as an Assembly constitutional amendment. The ballot argument in its favor stated that it was intended to protect both signers of initiative petitions and voters at the election from being misled as to the "over-all effect of the proposed amendment" and declared, somewhat optimistically, that an initiative confined to "one subject and one subject only" would enable voters to "readily understand just what the entire proposition is and not be confused or misled by a maze of unrelated matters, some of which are inadequately explained, purposely distorted, or intentionally concealed." (Ballot Pamp., Gen. Elec. (Nov. 2, 1948) pp. 8-9.)[1]

It seems self-evident that these objectives will be violated by allowing the electorate to vote on a measure which may be misleading, since the requirement is designed precisely to avoid that result. The language of the Constitution supplies forceful confirmation of this rationale. It provides that an initiative which contains more than one subject "*may not be submitted to the electors or have any effect.*" (Art. II, § 8, subd. (d); italics added.) This mandate does more than authorize a court in its discretion to prevent a proposal which contains more than one subject

---

[1]The argument in favor of the amendment stated, "Today, any proposition may be submitted to the voters by initiative and it may contain any number of subjects. By this device a proposition may contain 20 good features, but have one bad one secreted among the 20 good ones. The busy voter does not have the time to devote to the study of long, wordy, propositions and must rely upon such sketchy information as may be received through the press, radio or picked up in general conversation. If improper emphasis is placed upon one feature and the remaining features ignored, or if there is a failure to study the entire proposed amendment, the voter may be misled as to the over-all effect of the proposed amendment.

"Assembly Constitutional Amendment No. 1 entirely eliminates the possibility of such confusion inasmuch as it will limit each proposed amendment to one subject and one subject only.

"Protection is also given to those individuals who sign the sponsoring petition. People requested to sign the sponsoring petition will readily understand just what the entire proposition is and not be confused or misled by a maze of unrelated matters some of which are inadequately explained, purposely distorted, or intentionally concealed."

from appearing on the ballot. When viewed in light of its purpose, the constitutional provision compels the exclusion of such an initiative. An initiative which contains multiple subjects is no more entitled to a place on the ballot than one which contains an insufficient number of signatures; there is no less justification for withholding our power to strike the measure in one case than the other.[2]

I come, then, to the merits of petitioners' argument that the criminal justice initiative violates the single subject rule. Although this rule is of relatively recent vintage insofar as initiatives are concerned, our Constitution has long required that measures enacted by the Legislature embrace only one subject. (Art. IV, § 9, formerly art. IV, § 24.) A similar requirement appears in the constitutions of a large majority of states. (See Ruud, *One-Subject Rule* (1958) 42 Minn.L.Rev. 389.)

In determining whether a statute passed by the Legislature violates the single subject rule, the fundamental test is whether the provisions of the act are "reasonably germane" to one another. This standard is satisfied if the components have "one general object," if they refer to "projects so related and interdependent as to constitute a single scheme," or if they are "auxiliary to and promotive of" the main purpose or have a "necessary and natural connection with that purpose." (*Evans* v. *Superior Court* (1932) 215 Cal. 58, 62-63 [8 P.2d 467]; *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 172-173 [28 Cal.Rptr. 724, 379 P.2d 28]; *Tarpey* v. *McClure* (1923) 190 Cal. 593, 597 [213 P. 983].)

Shortly after adoption of the measure limiting initiatives to a single subject, it was held that the standards set forth above with regard to statutes were also to be applied to initiatives. In *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 92-94 [207 P.2d 47], the "reasonably germane" test was

---

[2]In *Amador*, we held that the single subject requirement was not violated by Proposition 13 (now art. XIII A of the Const.), a measure relating to taxation, which had been adopted by initiative some months before our opinion was filed. We stated the fact that the measure had received massive publicity diluted the risk of voter confusion or deception. (22 Cal.3d 208, 231.) Whether the criminal justice initiative will receive equally wide publicity we cannot predict. Obviously, however, we may not refrain from passing on the issue before us on the assumption that in a forthcoming election the effect of such a violation will be mitigated. To do so would read out of the Constitution the direction that a measure containing more than one subject "may not be submitted to the electors." Furthermore, it is clearly preferable to avoid the prospect of voter confusion by keeping an initiative which violates the Constitution off the ballot than to allow the proposal to appear before the voters and speculate after the election whether confusion resulted.

applied to a referendum proposal which repealed certain constitutional provisions governing aid to the aged and blind.[3]

An additional and more restrictive test of compliance was introduced in *Amador.* That test, proposed by the late Justice Manuel in his dissenting opinion in *Schmitz v. Younger, supra,* 21 Cal.2d 90, 100, measures whether the provisions of the initiative "are functionally related in furtherance of a common underlying purpose." We held in *Amador* that the four sections of Proposition 13 were both reasonably germane and functionally related to the general subject of property tax relief and that, therefore, the single subject rule was not violated. (See also *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, 38-42.) Thus, although Justice Manuel's test was expressed in a dissent, in substantial effect it has been adopted by this court. I fully accept it.

I next summarize the provisions of the criminal justice initiative to determine if it complies with the single subject rule. The measure adds one section containing seven separate subdivisions to the Constitution and repeals one section thereof (art. I, § 12, relating to bail). It also adds five new sections to the Penal Code and three more separate sections to the Welfare and Institutions Code.

The constitutional provision in the proposed initiative (§ 3) adds section 28 to article I, declaring that victims of crime have a right to restitution from wrongdoers for financial losses and the right to expect that wrongdoers will be punished. (§ 28, subd. (a).) The Legislature is directed to adopt provisions to implement the right to restitution. (*Id.,* subd. (b).) In addition, section 28 declares that students and staff of schools from elementary to high school have the right to be safe on school campuses. (Subds. (a), (c).) It provides that relevant evidence in criminal proceedings shall not be excluded (with certain exceptions) unless the Legislature provides otherwise in a statute enacted by a two-thirds vote (subd. (d)), sets forth standards and procedures for release of suspects on bail or on their own recognizance (subd. (e)), and

---

[3]More recently, some members of this court have expressed doubts whether the same test should be applied to legislative acts as to initiatives. (See conc. opn. of Tobriner, J., in *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 50 [157 Cal.Rptr. 855, 599 P.2d 46]; dis. opn. by Manuel, J. in *Schmitz* v. *Younger* (1978) 21 Cal.3d 90, 99 [145 Cal.Rptr. 517, 577 P.2d 652].) Their views merit more thoughtful consideration in these days of proliferation of initiative proposals.

allows the use of prior felony convictions for impeachment or for enhancement of a sentence (subd. (f)).

The Penal Code provisions in the initiative abolish the defense of diminished capacity (§ 4 [adds § 25, subd. (a)]), provide a definition of insanity (*id.*, subd. (b)), and prohibit introduction of evidence of diminished capacity or mental disorder except at the time of sentencing or commitment (*id.*, subd. (c)). The punishment of persons convicted of specified felonies who have been previously convicted of such crimes is enhanced. (§ 5 [adding § 667, subd. (a)].) A victim of crime is afforded the right to attend sentencing and parole proceedings and to make a statement at such proceedings; in imposing sentence or determining eligibility for parole, the judge or parole board shall state whether the criminal would pose a threat to public safety if granted parole or probation. (§ 6 [adding §§ 1191.1, 3043].) Plea bargaining as to specified crimes is forbidden except under certain circumstances. (§ 7 [adding § 1192.7].)

The three sections added to the Welfare and Institutions Code by the proposed initiative afford victims of crime the same rights with regard to the release of juveniles on parole as are described above. (§ 6 [adding § 1767].) A person convicted of a serious felony may not be committed to the Youth Authority if over the age of 18. (§ 8 [adding § 1732.5].) Finally, existing provisions of the Welfare and Institutions Code relating to the commitment and treatment of mentally disordered sex offenders are rendered "inoperative," except as to those previously committed under the program. (§ 9 [adding § 6331].)

Both petitioners and the proponents curiously miss the mark in their arguments relating to the single subject requirement. Petitioners, taking their cue from the arguments in the ballot pamphlet favoring the passage of the proposed initiative which adopted the single subject rule, focus their attack on the alleged "grossly misleading, deceptive and confusing" nature of the measure. But we do not have the power to exclude an initiative from the ballot because it is said to be misleading or confusing, unless it would violate the law to allow the voters to act on the measure. Thus, the decisive issue is whether the proposal transgresses the single subject rule. Only if such a violation is found does the issue of voter confusion become relevant.

The proponents argue that the initiative deals with one subject which they describe as "protection of the public from criminal activity." They

assert that the measure "attempts to accomplish this goal through interlocking reforms focusing both on victims of crime and on offenders." But the goal of all criminal law is, after all, to protect the public against crime. The entire Penal Code is so directed. The constitutional requirement is not satisfied by attaching a broad label to a measure and then claiming that its provisions are encompassed under that wide umbrella. Otherwise, initiatives which refer to "property" or "women" or "public welfare" or the "pursuit of happiness" could also be held to constitute one subject, no matter how diverse their terms.

Our decision should be based not on whether the provisions of this initiative may fit under some broad rubric, but on whether their substance meets the two tests set out above, i.e., whether its provisions are "reasonably germane" to one another, and whether they are "functionally related in furtherance of a common underlying purpose."

In my view, the measure fails on both counts. I can discern no "general object" or "main purpose" of the initiative more limited in scope than the one ascribed to it by the proponents, i.e., "protection of the public from criminal activity," which simply amounts to a claim that the subject of the initiative is criminal law or criminal justice. A few examples will suffice. The provisions for affording monetary restitution to victims of crime have "no necessary or natural connection" with the abolition of the program for treatment of mentally disordered sex offenders, and the declaration that students and staff are entitled to safe schools and the abolition of the defense of diminished capacity have no such connection with either. These provisions cannot be characterized as "so related and interdependent as to constitute a single scheme," or "auxiliary and promotive" of one another.

Since there is no common object among the numerous provisions of the initiative, it follows that it does not satisfy the more stringent test of a functional relationship in furtherance of a common underlying purpose.

The violation of the constitutional requirement poses a real danger of voter deception and confusion. Although the measure piously declares that safe schools are a right, it does not contain one provision referring to schools. A voter or the signer of a petition would reasonably expect that a lengthy amendment which states in one of its first paragraphs that "students and staff have the right to be safe and secure in their persons" on campus would contain some reference to and propose some

protection of that right in its substantive provisions. Only by carefully scrutinizing all the provisions of the initiative can one determine that this expectation is not fulfilled.

The proposal attempts to render "inoperative" the provisions of the Welfare and Institutions Code relating to commitment of mentally disordered sex offenders simply by adding a section to that code stating "this article shall become inoperative the day after the election . . . ."[4] The only indication as to what "this article" may refer to is contained in the title of section 9, "*Mentally Disordered Sex Offenders*." Presumably, therefore, the voter would know that the measure affects some provisions of law relating to such persons, but in order to determine what those provisions are he is required to go to a library and consult the Welfare and Institutions Code, ascertain which article was involved, and read the provisions of the article.

Many years ago, this court considered a similar defect in a local initiative. (*Myers* v. *Stringham, supra,* 195 Cal. 672.) The proposal purported to amend a local zoning ordinance by adding a legal description of property and by repealing a provision identified only by its number. The city charter provided that an ordinance could not be changed by its title, and that the terms of the ordinance to be changed "shall be set forth and adopted in the method provided in this section for the adoption of ordinances." The purpose of the charter provision was to compel a law to disclose on its face something of its purpose and effect. The Constitution contains a similar provision with regard to acts of the Legislature.[5] It was held that the initiative failed to comply with *the charter requirement, and the court denied a writ of mandate to* compel the city clerk to certify the petition as sufficient. The observations in the opinion are instructive: "The wisdom of the requirement [of the charter] is at once apparent from an inspection of the proposed ordinance. The new subsection sought to be added to the section by amendment is no more than a description of certain real property. It does not purport to disclose what the effect of its adoption would be ei-

---

[4]Section 9 of the initiative states: "*Mentally Disordered Sex Offenders.* Section 6331 is added to the Welfare and Institutions Code, to read:

"6331. This article shall become inoperative the day after the election at which the electors adopt this section, except that the article shall continue to apply in all respects to those already committed under its provisions."

[5]Article IV, section 9, of the Constitution, which contains the prohibition against a statute which embraces more than one subject, also provides: "A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."

ther on the status of the particular property described or on its relation to the general zoning classifications in the city. It cannot be determined from its inspection what is sought to be accomplished. If the petition were examined and certified and ... if the requisite number of votes were to be cast in favor thereof it would still lack the sanction of the charter to give it legality.

"If in any event the proposed ordinance would be void, mandamus will not lie to compel its examination and certification for the reason that the writ may not be used to compel the performance of an act which would have no effect in law." (195 Cal. at p. 676.)

This language and reasoning is, in my view, directly applicable to the case at hand.

Moreover, the provisions of the initiative cover subjects so broad that they effectively repeal substantial portions of the Evidence Code, the Penal Code, and the Welfare and Institutions Code, although the measure purports to enact eight statutes and one constitutional provision, and to repeal one section of the Constitution. The title and summary prepared by the Attorney General demonstrates that even under the most liberal interpretation of the constitutional requirement the criminal justice amendment cannot be construed to contain "one subject and one subject only." (See fn. 1, *ante.*) The Attorney General enumerates at least 12 subjects in the measure, and adds an enigmatic catchall: "and other matters."[6]

In view of my conclusion that the proposed initiative violates article II, section 8, subdivision (d), of the Constitution, I need not discuss petitioners' additional assertion that it is also unconstitutional because it amounts to a revision rather than amendment of the Constitution.

---

[6]The title and summary is as follows: "CRIMINAL JUSTICE. INITIATIVE STATUTES AND CONSTITUTIONAL AMENDMENT. Amends Constitution and enacts several statutes concerning procedural treatment, sentencing, release, and other matters for accused and convicted persons. Includes provisions regarding restitution to victims from persons convicted of crimes, right to safe schools, exclusion of relevant evidence, bail, use of prior felony convictions for impeachment purposes or sentence enhancement, abolishing defense of diminished capacity, use of evidence regarding mental disorder, proof of insanity, notification and appearance of victims at sentencing and parole hearings, restricting plea bargaining, Youth Authority commitments, resentencing of *persons previously committed as mentally disordered sex offenders,* and other matters. Fiscal impact on state and local governments: The Legislative Analyst and the Director of Finance advise that they are unable to determine the net costs at this time but indicate that the measure would result in substantial increases in state and local expenditures."

I would order a peremptory writ of mandate to issue directing respondent to take no further steps toward placing the criminal justice initiative on the ballot.

Bird, C. J., concurred in part II of this opinion.

**BIRD, C. J.,** Dissenting.—With some reluctance, I write separately to express my reservations about some troubling aspects of today's decision. I fear that the tremendous time pressure surrounding this case has forced this court to set down precedent that may return one day to haunt us. Further, a number of difficult, unresolved issues concerning the Legislature's last-minute revisions of the laws governing initiative petitions have not been addressed.

At first blush, it would appear that the Legislature's speedy action on this matter was a blessing for the court, taking us off the hook and arguably rendering moot an issue that might well have proved thorny and divisive. Perhaps, we should be grateful for the Legislature's extraordinary speed and accept our deliverance with quiet thanks. However, this easy and practical solution does not adequately resolve the legal issues presented by this bail-out statute.

Without a doubt, the Legislature has the power to change the rules governing the qualification of initiative measures for the ballot. The California Constitution mandates that initiative petitions contain a certain number of valid signatures but specifically authorizes the Legislature to provide a method for the certification of such measures. (Art. II, § 8, subd. (b) and § 10, subd. (e).) Clearly, the Legislature is authorized to enact, revise and amend its regulations. In this case, however, the method chosen by the Legislature to alter long-standing statutes raises several serious questions.

The most troubling aspect of the Legislature's action is that it creates a one-time-only exception to a statutory scheme. Normally, signatures must be individually verified and counted unless a statistical sample shows that the petitions contain more than 110 percent of the requisite number. For this election only—*apparently for this initiative only*—105 percent will be sufficient. In effect, the Legislature has isolated an initiative which it favors and changed the qualification requirements for it *alone*. In the future, can we expect to see similar exceptions made whenever an attractive or politically volatile initiative fails to qualify under the normal procedures that apply to everyone else?

Here, the Legislature has set up a new method by which to qualify an initiative: if an initiative fails to qualify according to the requirements set down by statute, the proponents simply lobby the Legislature for a special statute which would exempt their proposal.

What problems will this case-by-case bending of the rules create in the future? Will the Legislature extend this privilege to all initiatives that fall short of the 110-percent cutoff—or only to initiative measures that it favors? Will proponents of initiatives that are rejected because they fail to meet the 110-percent cutoff be entitled to assert equal protection challenges if the Legislature refuses to grant them the same relief?

Such individual exemptions from the rules established by the statutes make a mockery of the whole initiative process. By using a sliding scale of qualification which varies from initiative to initiative, the Legislature has improperly injected itself into an arena in which it has no place, for the Constitution reserves to the people the power to qualify and vote on initiative measures. Only a neutral, evenhanded body of law governing the qualification process can ensure that the initiative process remains open to *all* of the people, free from arbitrary loopholes and exceptions.

This statute also represents an end-run around a clear mandate of the California Constitution. Article II, section 8, subdivision (c) requires that an initiative measure be placed on the ballot at the next general election "held at least 131 days after it qualifies . . . ." This initiative, therefore, could be placed on the June 1982 ballot only if it qualified as of January 28, 1982.[1] Clearly, it did not. As of that date, the initiative had failed to qualify by either of the then-permissible means—a statistical sample showing more than 110 percent of the requisite number of valid signatures or an individual count of the signatures.

[1]An additional issue, not raised by the parties here, apparently has never been resolved by this court. The Constitution requires that initiative and referendum measures be submitted to the voters "at the next *general election*" after the measures qualify, or at a special election called by the Governor. (Cal. Const., art. II, § 8, subd. (c) and § 9, subd. (c), italics added.) The Elections Code defines a general election as "the election held throughout the state on the first Tuesday after the first Monday of November in each even-numbered year." (Elec. Code, § 20.) A special election is an election the timing of which is not otherwise prescribed by law. (Elec. Code, § 27.) The election scheduled for June of 1982 is a regularly scheduled "direct primary" (see Elec. Code, § 23)—not a special election or a general election. Thus, the constitutionality of submitting an initiative to the voters at a June primary election would appear to be an open question.

May the Legislature now change the rules and retroactively declare the initiative qualified as of last January? Such an act of legerdemain threatens to defeat the purpose of the constitutional mandate. The 131-day rule serves as a guarantee that the electors will have an adequate opportunity to carefully and thoroughly analyze an initiative measure before casting their votes. By deeming an initiative qualified after a substantial part of the 131-day period has already passed, the Legislature decreases the time available for discussion and debate on the measure. If the initiative passes in June, will there be litigation claiming that the measure cannot be enforced because of the substantial shortening of the constitutionally required time period in which to campaign against the measure?

The Legislature's action also raises a host of additional questions. Does the new statute create a reasonable legislative classification? Is there any rational reason to favor one initiative without granting the same relief to all future initiative petitions? Does the statute violate article IV, section 16 of the Constitution, which provides that a special statute is invalid if it covers an area to which a general statute already applies? Finally, does this statute represent an impermissible legislative incursion into the adjudication of the legal merits of a pending case? Clearly, the Legislature through its action resolved the legal issue in this case for the majority of the court. Who then was the real adjudicator, the court or in truth the Legislature? These issues remain unexplored since they were not fully briefed by the parties nor fully analyzed by the court.

As the initiative and referendum processes become more and more frequently used by the people, the need for uniformity and predictability in the statutes and case law governing them grows. For this reason, I join my colleague Justice Mosk in urging that the court address the single-subject issue *now*, before the initiative is placed on the ballot. Should the court determine that the measure as presently drafted fails to satisfy that rule, an early resolution would enable the proponents of the measure to redraft the initiative. If a majority of the voters do favor some or all of the initiative's provisions, a postelection ruling that the single-subject rule has been violated will only delay the ability of the people to implement their will. California's citizens have a right to know *now*. The failure to rule on this issue does not implement the will of the people but merely postpones the problem, creating the possibility of an even greater frustration of that will in the future.

In addition, an immediate decision on this issue would clarify the governing law in an area that is now the source of much confusion. Initiative proponents have a right to be spared endless litigation over the procedural adequacy of their measures. This court should address the issue squarely, setting forth the constitutional requirements so that the proponents of future initiative measures will know what the Constitution requires of them.

I share Justice Mosk's view that this initiative violates the single-subject rule. The numerous provisions of the initiative fail to satisfy the stringent requirement of a functional relationship in furtherance of a common underlying purpose. Even if each of the provisions might be said to further the broad general purposes of deterring crime and protecting the public from the consequences of crime, the provisions do not have any functional relationship to each other. Thus, the requirement of restitution to victims is not related to the redefinition of insanity—or, in fact, to any of the other provisions of the initiative. Similarly, the declaration that students and staff have a right to safe schools is not functionally related to the other provisions.

Numerous provisions which fall under some broad single subject may withstand a single-subject challenge, but only if the provisions fit together into some cohesive whole.[2] The disparate provisions of this statute do not meet this test. They represent a grab bag of proposals designed to respond to concerns about crime, safety in the schools, and the expenditure of public funds. However well meaning each section might be individually, as a group these subjects are too diverse and unrelated to meet the requirements of the single-subject rule.

---

[2]See, e.g., *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 229-232 [149 Cal.Rptr. 239, 583 P.2d 1281], finding that the separate provisions of the property tax relief initiative were all "reasonably interrelated and interdependent, forming an interlocking 'package' deemed necessary . . . to assure effective real property tax relief." (*Id.*, at p. 231.) "Each of the four basic elements of article XIII A was designed to interlock with the others . . . ." (*Id.*, at p. 232.)